I am so disgusted, I can't tell you how disgusted I am. Good morning, may I reserve five minutes for rebuttal time? Yes, it's granted. Thank you. May it please the court, my name is Joshua Bardavid, attorney for Petitioner Mr. Gow. The decision of the IJ contains erroneous factual conclusions, contains an unduly harsh reading of the record and that harsh reading read in light of the IJ's frankly inappropriate moral judgments of Mr. Gow indicate that this was not a fair and neutral arbiter of fact, but in fact this was an immigration judge searching the record for basis to deny. For these reasons we respectfully assert that There's a moral judgment. His wife is admittedly weak, has a baby in April, is pregnant in June, authorities are looking for the IUD or whatever and he leaves in July and now is fighting not to go back. It's hard not to draw at least some, you know, to have questions about that. I certainly understand your Honor's concern, but in fact Mr. Gow did provide an explanation in fact that they had contacted together a smuggler to assist them in leaving the country. He skipped, he skipped is what he did. Mr. Gow? He skipped. Well, according to what Mr. Gow stated was in fact that the smuggler gave him the passport first and said he had to leave first and that his wife would follow behind and then in fact the smuggler apparently reneged on that and took their money. In addition, Your Honor, I think it is important to consider Is that in the record that the smuggler reneged? I believe he does make a statement to that effect or that I thought that the passport didn't come through. or something along those lines. And he does give an explanation as to that. I don't have the exact page citation to it, but he does certainly address the concerns on the remand hearing because the IJ had raised it in the first instance. What are the main inconsistencies that you believe are wrong? Because it seems like it's a mixed bag here. Yeah, there are certainly several points that the IJ raises. But at the outset, Your Honor, I would like to highlight the fact that this is all taking place under the context of voluminous supporting documentation, which in fact corroborates his claim. So even if there were inconsistencies, most importantly, there was the IUD certificate confirmed that his wife had an IUD. Why haven't you raised that as an issue? That was raised in our briefing. You allude to it at page 18. You allude to it in passing. It's not raised as a point. Your whole brief is about the inconsistencies. It wasn't raised at all in the first hearing. It was barely alluded to in the second. And I just assumed it was a tactical matter because so many of these documents are fraudulent in the future. And the problem is you decided you're not even going to bring them up. The reasons that it wasn't fully addressed below I can't speak to. In terms of our brief, we felt that it was sufficient to point it out. But in terms of the detail for belaboring what's going point by point of the IJ's negative credibility determination, we simply like to highlight the fact that, for example, Your Honor states that there is indication that there's some fraudulent documents coming from Fujian province, but the IJ doesn't make this note. Wait a minute. The reason the IJ doesn't make this note is because nobody, there was no effort to elicit any testimony as to these documents. There was no effort to authenticate them. There's no country report coming out of the government. Those documents came in, I think it was Exhibit 3, and they were barely referred to at all. So there's no testimony, such as there was in Chen, about the fraudulent, the huge percentage of documents that are false, fake, fraudulent, coming out of the Fujian province, about the State Department country reports that talk about, they are unfamiliar that any such documents are ever issued by hospitals in the Fujian province. So there's nothing in the record about that. I understand, and I can't speak specifically to why counsel below chose not to specifically address it. But again, Your Honor, these points that you're raising, nevertheless, the documents were accepted into the record. The IJ chose not to reject them. In terms of the fraudulent documentation issue that you're raising, in fact, if the court seeks to take judicial notice of the State Department report that you're referring to, they indicate that about 60% of the documents are fraudulent. But that's not in the record of this case. Correct. Correct, Your Honor. There is nothing in the record of this case other than those pieces of paper, about those pieces of paper. Correct, Your Honor. And the wife's letter, which seems like, I mean, is the one that could have been easily made up, the wife's letter, as compared to the others. Again, this is, we would have to be speculating. The IJ gave no discussion whatsoever of any of these points. But you didn't raise, you, the editorial, you didn't raise it before him any more than you raised it before us. The requirement that the IJ review documentation submitted before him is, it's my understanding, Your Honor, is a fairly well-established point of law. I think to preemptively raise the fact that the IJ is not going to. So that you can submit these documents, let's just talk about the two documents, the IOD certificate and the abortion certificate. You can submit these documents to the IJ without authenticating them, without having any testimony as to them, and for the rest, the course of these proceedings, they are deemed authentic and as pure as the German snow. No, Your Honor, that's not what we would be asking. You say you don't have to authenticate them. No, what I'm saying, Your Honor, respectfully, is that in light of the fact that the government did not challenge them, in light of the fact that they did not submit to country reports which indicate that there is some fraud coming at it from Jim Providence, the IJ, at the very least, would have to acknowledge the existence of these documents and explain why he chose not to believe them, considering that they were admitted and made part of the record. What's your best case for that proposition? The fact that these documents have gone unchallenged. No, I'm saying in terms of the case law that we've decided, where the government doesn't object and that the IJ has the obligation to review on the record, indicate on the record, his view of the documents submitted. Frankly, Your Honor, I do not know if there's any specific, I wasn't able to find a case where... He did. He may have, and given the inconsistencies, he may have decided they were all fake. Then, again, I think the case law, then, that we would rely on is the litany of cases that say that IJ may not speculate, and, in fact, the IJ must provide statements as to the reasons that a decision is not to be believed. I believe it's Osario v. INS would be one of the cases that... Take it to the next step. Take it to this level. The issue was not raised on appeal. Why should we not say it's been waived, that specific issue? I believe that the error of the IJ in not considering it would go to the heart of the claim, and this court does have jurisdiction, and I believe there are past cases. I believe it was the Chen case where this court did accept arguments not raised below where it would be manifestly unjust. Yeah, but the Chen case, the whole case, or a lot of the case, was about the fraudulent nature of the documents. Here, it wasn't raised below, but that's not my question. My question is it wasn't raised to us in the blue brief as an issue. It wasn't raised as a point heading, Your Honor, respectfully, but I do believe that we... Well, you say the credibility determination was wholly unsupported by the record, and then you say prior to discussing the substance of it, it is important to note, so I guess it's... That's the only reference in the whole brief at page 18 to the fact that these documents corroborated. That's not, in my view, I mean, I'm not sure. I'm thinking aloud. Is that enough to say you did not waive the issue? I believe that considering that we, especially with the fact that we say it is important to note that we are highlighting the fact that this is... We simply wanted to bring to the court's attention the fact that this negative credibility determination was coming in light of unreviewed documents. Now, obviously, from a strategic standpoint, in all frankness to the court, the reason that it wasn't made a point heading was because of the acknowledgement that the attorney below did not raise it as a major point, and simply I was trying to stick to the issues that were fully developed. Yeah, I wasn't raised to the IJ, and I wasn't raised to the BIA either. Right, and I think it would be disingenuous for me to claim that it was. I appreciate that. And so we didn't want to belabor that point in our brief because, frankly speaking, I'm aware of this court's precedent that it generally will not consider issues not raised below, but I was simply trying to make the point when we went down this route that this is just coming in light, this incredibly harsh, harsh reading of the record, these, frankly speaking, errors, factual errors. Well, you've got an uphill battle, don't you, considering the standard of review? Yes, Your Honor, we do realize that as a general matter, but in light of this and taking the recent decision, I believe 2005 decision of this court in the Zhang case, where IJ Pugliese made almost the identical statement regarding judgments about one spouse leaving another in China while they come to the United States, I think this raises serious doubts as to IJ Pugliese's fairness in addressing these cases. Well, I mean, we obviously can't separate ourselves from some knowledge of that, but it certainly can't impact how we view this. Let me ask you a question. If, in fact, the IJ believed that she had an abortion on August 7th and had an IUD inserted on August 15th, but didn't believe Gao's story about, you know, she was going to come later, you know, the story about how he cared about this and didn't believe that aspect, couldn't he nonetheless have done what he did and said, you know, I'm not going to keep you here. I don't believe that part of the story. You left your wife at about the time she was going to suffer this, and she did suffer it. I don't believe the rest of your story. Couldn't that have happened? Respectfully, no, Your Honor. I believe that if the IJ concludes that, in fact, his wife was forced to leave as a matter of law under the statute, he wants to deny as a matter of discretion that he is unworthy. That would be a separate instance, but, in fact, there has been no such finding. Is that under what's the case of the statute CYZ? Yes, Your Honor, that you can deny as a matter of discretion, but under a matter of PULA, the board said, in fact, that the danger of persecution should outweigh all but the most egregious of persecutions. Where is the persecution here? Where is there any potential persecution? The daughter was born more than five years ago, so if he went back and if his wife would take him back, I shouldn't have said that, he could have another child without suffering any consequences because it's more than five years since the last one, correct? That, if I may, just before I will, yes, Your Honor, that is correct based upon what he said, but, however, the key point is that, in fact, the claim is not predicated exclusively on a claim of a well-founded fear. In fact, it is also based on a matter of CYZ past persecution. I know, but he can go back and have another child. Based upon his understanding, and he said he's not entirely certain of the Chinese family planning, that after five years he could… But that's the law. He can have… Well, we don't actually have the Chinese law in the record, but, yes, Your Honor, as the record stands, that is what was stated. The client testified about that. Yes, exactly, yes, but he did make a note that he wasn't certain. At that point, it was only four and a half years, but now it's over five. Correct, but, again, there's a presumption of a well-founded fear based upon the past persecution, and that is only rebutted by the government on changed country conditions, and there's been no such showing. Well, yes, there's one fact I'm not sure if I recall correctly. When he was asked to name a country to which he would return, he was asked if it would be China, and he said no, he wouldn't agree to go back to China, correct? Correct, Your Honor. Thank you. Good morning, Your Honors. My name is Paul Mansfield. I'm an assistant U.S. attorney in the Eastern District of Pennsylvania, and I represent the government in this case. The government's position, Your Honors, is that the immigration judge correctly concluded, and the BIA has properly affirmed that particular conclusion, that Gao simply did not present a credible claim for asylum or withholding of removal or relief from the Convention Against Torture. Give me your best shot as to which of these inconsistencies are the ones that the IJ was appropriately skeptical about, because there's a couple of them that really aren't inconsistencies, and it seems like, well, I'll throw a half a dozen and see what sticks. So what is it in this record where we should say, ah, of course it's made up? It's incredible because you can't say this one time, you can't say this another time. You just can't. Judge Rendell, I think that that question has to be viewed in the context, first of all, that the immigration judge's decision is based on, A, the serious question he had about the credibility of the story, which is provided by Mr. Gao at the time of this hearing, and then the case was specifically remanded for the court to articulate specifically inconsistencies or problems with respect to the credibility issue. And then the IJ did. And then he did, Judge Rendell. And I think overall, my point simply is, each and every one of these inconsistencies cannot be looked at in a vacuum. They have to be construed as a whole. Well, I'm looking at them bit by bit because I think if you take one and you don't buy the inconsistency, you look at the record, there is no inconsistency, you throw that to one side, you look at the next one, and if we have six of them and you throw them all to the side, then you have nothing. So I think you have to go piece by piece. And I'm wondering out of the six, which ones, I mean, the first two are wrong. If I may, Judge Rendell, I was going to say that if you want me to take my best shot in terms of the six in and of themselves, and I readily concede that sometimes we're dealing with individuals who are speaking in a foreign language and what are consistencies may not necessarily be material inconsistencies. I do not concede that one and two are not inconsistencies, but I would say that the government's probably most compelling argument is with respect to the differences in the testimony regarding whether or not a written notice was received prior to the time the individuals actually went to the house. I think there's a very significant distinction. This affidavit says a notice but also mentions cadres coming to the house in paragraph 9, 12, 20, 21, and 22. So the affidavit didn't just say notice and then the testimony said they came to the house. The affidavit said both. The affidavit said both, but the issue is that the notice, whether or not the notice came first or whether or not the people came at the house, and that's what Judge Pugliese relied on. Judge Pugliese looked at the fact that there's a very big difference between receiving a notice and taking action as a result of receiving that notice and people coming to your house. But if both of the things mention that the people came to the house and one of them also mentions a notice, how is there an inconsistency? Judge Rendell, I think that there is an inconsistency between the sequence of events and what actually occurred that is different than what was said at a prior time. I think in looking at the inconsistencies, you have to look at what is said in the INS form, what is said at the time of the first hearing, and what is said at the time of the second hearing. And I'll be happy to take each one individually, Judge, if you would like. What's your best shot? I'd like to take my best shot by, first of all, echoing Judge Chigars' point, which is with respect to the asylum law, the individual has a very uphill battle here. The findings have to be upheld if they're supported by reasonable, substantial, and probative evidence. And a finding with respect to adverse credibility should only be overturned if there is compelling evidence to the contrary. Compelling evidence to the contrary. Furthermore, our court has said the decision must be affirmed unless the evidence not only supports a contrary conclusion, but compels it. And as this court has previously recognized, this is an extraordinarily deferential standard. This court will reverse the determination with respect to the applicant only if a reasonable fact finder would have to conclude that the requisite fear of persecution existed. So my best shot, Judge Rendell, is that this examination and factual inquiry which is being made has to be made in the context of the law which this court has decided with respect to the burden that the individual has. Taking that in its context, we set forth the inconsistencies with respect to each and every one. And if the court wants me to go through each and every one, I will. But what I will say, Judge Rendell, is there's always the possibility that there may be an innocent construction. There's always the possibility that what appears inconsistent to one person may not necessarily be inconsistent to another. But at the same time, the person who's making that determination is the fact finder, the immigration judge who hears cases like this every day on a day-to-day basis, who has the experience, and this court has made clear that the immigration judge as the fact finder is in the best position to make decisions on credibility. Although sometimes if you get the feeling that they're looking just for inconsistencies because then they can do an adverse credibility determination. I mean, I'm not casting aspersions on the IJs generally, but let me ask you a question. Of course, Judge. Are we out of the inconsistencies have to go to the heart of the matter? From a timing standpoint, is that applicable to this case or not? Because that was changed. Well, I think that the inconsistencies do go to the heart of the matter. But if somebody was at the aunt's house or somebody was at the mother-in-law's house, does it matter? Of course, because it becomes a question of credibility, which is the evidence that the court has before it. But the immigration judge had the testimony of one witness, and that was Mr. Gow at this particular hearing. And I know that Judge Barry has made note, and I think the court has heard cases where there have been instances of fraudulent documents that have been provided and fraudulent evidence. There was nothing of that in this case. That's correct, Judge Barry. However, I think that what has to be taken into account is courts in the Second Circuit and other circuits have made note of the fact that frequently individuals coming in seeking asylum will follow a script, a set course of statements in order to advance their claims. You say that the essential question before the immigration judge was whether, as you put it, any of these events happened. That is, whether Gow's wife had faced a forced abortion due to abhorrent practices of a foreign government or whether Gow was simply contriving a story in an effort to gain asylum. Put the little inconsistencies one way or the other aside. That that was really the issue he had to decide, whether there had been an abortion, right? That's what you say at page 43. Yes, Your Honor, but the context of that particular statement has to be seen in the context of our larger argument, Judge Barry, which is you'll look at the inconsistencies, you'll look at the overall story, which Judge Randell pointed out, is there's this guy, he's got a two-year-old, his wife is pregnant, and he bolts a short time after that. You say the abortion certificate is entitled to virtually no weight. What is that based on? Well, as the Court correctly pointed out, first of all, the documents were in evidence. There's no question about that, and the documents were presented. But what was raised by counsel representing Mr. Gow was the issue of the inconsistencies. The documents are what they are. They speak for themselves. Authentication has not been addressed in the record. Did the IJ have to address them, the documents, and somehow discount them? Because if they are real, then inconsistencies or not, if he's married to her, then don't certain results follow under CYZ? I mean, whether he left her high and dry or not, if he's married to her and she had a forced abortion. Well, Judge Randell, I think that documents have value. Documents have evidentiary value. Documents, however, are not necessarily dispositive. The most important evidence here... Are we into Judge Gow, Justice Alito's opinion in Zhang, where we don't know what weight he accorded these documents because they were not addressed? Well, Your Honor, I would readily concede that that is not a matter that is addressed in the decision itself. The focus of what Judge Pugliese was doing was providing and making factual inquiry in order to satisfy the BIA's conclusion that the conclusions he was reaching were not mere speculation, but that there was an evidentiary basis for that. Are you saying that because the documents were not explicitly invoked, either before the immigration judge or then before the BIA, that there was really no opportunity or even, I guess you would say, necessity to even get there? Well, the documents were submitted. The government would submit that was a tactical decision on the part of counsel representing Mr. Gow as to what he thought Mr. Gow's best shot was. And Mr. Gow, he thought his best shot was to deal with the issue of the credibility and the inconsistencies and his argument was, this guy's telling the same story. And these inconsistencies are much ado about nothing. And that gets me back to the important point here is, I've done a number of these... But can I get back to my question? If that sterilization, if those certificates are authentic, is he not then entitled to the relief? Even if he told the story about flying to the moon, if he is the husband and this happened, is he entitled to relief under CYZ? A couple of things on that, Judge. First of all, I think you mean the document with respect to the abortion? Yes. Rather than the sterilization? There wasn't a sterilization. I'm as bad as he is. There was a record with respect to the abortion. There is also testimony with respect to the implantation of the IUD. There are two certificates of the record. With respect to the abortion, your question is premised on if it's authentic. The problem with that, first of all, is there was no demonstration at the time of the hearing that this was an authentic document. But am I correct that if it is authentic, he's entitled to relief? No, Judge Rendell. Under CYZ, I think if you accept the analysis that's set forth in CYZ, I think your Honor raises a good point because that puts Mr. Gao in his wife's shoes, so to speak. If one buys the CYZ analysis, this Court has never adopted officially the CYZ analysis. So, assuming for purposes of argument, though, that the CYZ analysis is accepted by the Court, nonetheless, Mr. Gao is not home free because the issue then becomes the sufficiency of the evidence that is presented in order to establish that this is an authentic document. And, clearly, the evidence that was presented in this particular hearing was insufficient. So, my answer is two-pronged. It's not clear that it does apply, but if the CYZ does apply and the Third Circuit hasn't specifically said that it does, it hasn't ruled on that issue, then, indeed, I think the Court raises a very good point, but there's an issue as to the sufficiency of the evidence which has been presented. A couple of other issues, as I conclude. This isn't a moral judgment. It's incorrect. The immigration judge's analysis, it didn't represent a moral condemnation of what was occurring. It's looking at the strange nature of what's going on here and determining that that didn't happen at all. And I think that that's perfectly appropriate for the Court to look at a scenario and determine whether or not it's inherently reliable or it's unreliable. So, there's no moral judgment that the case was made. And, with respect to the matter that Judge Puglisi handled, let's keep in mind that this isn't the first hearing. There was an initial hearing, and this matter that is before the Court right now is a remand. The government's position is that under the applicable law, Mr. Gow has to show compelling reasons why that decision should be overturned and why the adverse credibility should be overturned, and he has simply not met that burden. Thank you. The Court doesn't have any other questions. Thank you. Your Honor, briefly, I'd just like to address a couple of points. First, with respect to whether or not this Court has adopted CYZ, I would respectfully assert, in fact, that in the case of Kaiyuan Chen, I don't have the citation, but it was written by Justice Alito in 2004, which was addressing whether or not to extend CYZ to boyfriends, unmarried spouses. In fact, in that case, basically by acknowledging CYZ as good law, implicitly adopted CYZ into the Circuit's law. And, in any event, more importantly, CYZ has not been overruled by the Circuit, and therefore the Board would be bound by its own precedential decision, unless and until it was overruled by the Circuit. So, therefore, the Board would be required, in the event that it determines the abortion did take place, to grant asylum, absent a discretion or a denial as a matter of discretion. Then we would be left with the question of withholding and cap. With respect to the, I guess, the government's best shot, aside from what we've acknowledged is our difficult road to hoe, in light of the standard of review, the notice issue, I would just like to highlight the fact that Mr. Gao did, in fact, indicate that he received notice and that he was visited multiple times, both in his oral testimony and in his written application. Now, granted, he did not necessarily tell it in the most clear, linear style, but he also did not indicate that one definitively happened before the other. And it is a little bit difficult to understand, given that the testimony was somewhat halted. He said he received notice, but that was only in his affidavit. I believe on page 121 of the record, I don't know if he uses the exact words written notice, but he does say it seems to read as in that he is, in fact, receiving written notice on page 121. And he says the question, but I mean, what did she do? Did she have the child? Did she not? At the month of July, they asked for ring insertion, so we went into hiding. I would certainly contend that is sufficient to indicate that he was receiving written notice. Really? Yes, Your Honor, I would. And in any event, I think this is such a minor point and such a remission of one single word, whether or not he says it's written or not. And where the judge was so concerned, and the judge, I believe, refers to this as one of the examples of the worst inconsistencies. If the judge was so concerned, I would respectfully assert he would have the obligation to at least try to clarify. But certainly in light of the fact that in all other respects, we believe that Mr. Gao's testimony was consistent. One of the difficulties here as well is that he fled China on July 28th. And everything that happened subsequent to that time, the abortion, the insertion of the IUD, is all hearsay. Yes, Your Honor, I certainly understand that concern. Again, this is why the importance of the documents come into play. And just two points briefly. I would just note for the court that in fact the counsel below did raise the failure of the IJ to consider these documents on page 21 of the record in his brief to the board. He mentioned it a couple of times in passing, but that was not the thrust of his application. That was not the thrust of his appeal to the BIA. Yes, I would certainly concede that. But that does not mean he did not raise it, and I believe it is sufficient to preserve it on appeal for this court to consider that issue. And, again, going back to Your Honor's question at the beginning about the road that we have upheld to considering the standard of review and where there may be specific instances where there's two plausible possible interpretations, and we would actually agree with the government in this, is that you do also have to look at it as an overall finding. And in light of the fact that the IJ is so incredibly harsh, and the IJ has in the past been criticized by this court for considering factors that are not directly relevant to the main question. That's not in the record now. That's not nice to say that. In other cases, he's been criticized. I apologize, Your Honor. It's really a matter of public knowledge. Judicial notice of what we've said. Judge McKee, I believe, did mention him by name in the case of Zhang, which is the reason why I – Yeah, but you suggested in your brief that Judge McKee's was the opinion that remanded Zhang to another immigration judge, and it wasn't because it wasn't remanded to another immigration judge. It was remanded to the Board of Immigration Appeals with the suggestion that it further – No, it wasn't. No, no, no. Justice Alito, Judge Alito, then Judge Alito, wrote the majority opinion, and it did not suggest that another immigration judge be appointed. I apologize. I didn't mean to – I certainly did not intend to misconstrue his – Let me change tracks for a minute. In looking at your brief, the government deals with your CAT claim. You don't really deal with your CAT claim, per se, in your blue brief. Is there a reason for that? Your Honor, I believe that it was the CAT claim was not addressed below, and therefore we felt that – and in any event, we felt that the major issue related to the credibility of the asylum in light of the fact that the negative – there was no denial as a matter of discretion. So the key issue is whether or not there was a forced abortion. And in essence, in all honesty, Your Honor, I don't believe the record – we can see the record wouldn't necessarily support a claim that he would be tortured. There was no such showing. So we – I think it would be somewhat disingenuous to do so. But we do not feel it is disingenuous to highlight the fact that the judge was predisposed to deny this in light of his fairly extreme comments. And we also can look to the 2002 decision where he makes all kinds of speculation that he probably was just coming here for work and things like that, and we find that inappropriate in a case for asylum. Thank you, Your Honors. Mr. Burdett, were you appointed in this case, or were you retained? I was retained. Yes, I was here. Thank you. All right. Thank you. Thank you, counsel. The case is well argued.